937 F.2d 616
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
William Joseph "Smokey" LEE, Petitioner-Appellant,
v.
Frank THURMAN, Sheriff, Attorney General of the State of
Oklahoma, Respondents-Appellees.
 No. 89-5129.
 United States Court of Appeals, Tenth Circuit.
 July 10, 1991.
 
 Before McKAY, SEYMOUR and EBEL, Circuit Judges.
 ORDER AND JUDGMENT*
 SEYMOUR, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 2
 Petitioner appeals from an order of the district court entered following a remand from this court. Lee v. Thurman, Unpublished No. 86-2333 (10th Cir. filed Oct. 21, 1988). In that order, the district court adopted the magistrate judge's recommendation that the use of an uncounseled, hence invalid, 1953 conviction for the purposes of impeachment and enhancement in petitioner's 1969 trial was harmless error. Therefore, the use of the 1969 conviction for purposes of enhancement in 1984 was without error. Upon review of the entire record, we affirm.
 
 
 3
 Petitioner commenced this action in district court pursuant to 28 U.S.C. Sec. 2254. He alleged that the sentence he received in 1984 in Oklahoma for armed robbery was improperly enhanced by a 1969 Oklahoma conviction of first degree rape after former conviction of a felony. Petitioner alleged that that conviction was tainted by the use of a 1953 uncounseled Minnesota conviction.
 
 
 4
 Petitioner has served the 1969 sentence. He will serve the enhanced 1984 sentence following completion of a ninety-nine-year sentence he is presently serving in Texas. Petitioner is in custody for the purposes of this action. See Lee, slip op. at 2.
 
 
 5
 Following the remand from this court, the magistrate judge found that petitioner's 1953 conviction was invalid because petitioner had not been represented by counsel. See Findings and Recommendations of U.S. Magistrate, filed March 8, 1989. However, the magistrate judge held that the 1969 conviction was not tainted thereby because (1) the jury was properly instructed that the 1953 conviction was admitted solely for the purpose of testing petitioner's credibility; (2) there was no indication the jury considered the 1953 conviction to establish guilt; and (3) the 1953 conviction "was not the only conviction admitted and used to test [petitioner's] credibility." Id. at 7. The court adopted the magistrate judge's recommendation and denied the petition.
 
 
 6
 On appeal, petitioner argues that his constitutional rights were violated because the 1969 conviction was invalid and should not have been used to enhance his 1984 sentence.[1] We must first determine whether the use of the 1953 invalid conviction in petitioner's 1969 trial was harmless error before we address the use of that conviction in 1984.[2]
 
 
 7
 The Supreme Court has stated that the use of a conviction obtained in violation of Gideon v. Wainwright, 372 U.S. 335 (1963), against a person either to support guilt or to enhance punishment of a later offense is "inherently prejudicial." Burgett v. Texas, 389 U.S. 109, 115 (1967). The use of prior invalid convictions for impeachment purposes deprives a defendant of due process where their use might have influenced the outcome of the case. Loper v. Beto, 405 U.S. 473 (1972). The Court left open the possibility that the admission of a prior invalid conviction might in some cases not constitute reversible error. Id. at 483 n. 12 (Stewart, J., concurring) and 485 (White, J., concurring). However, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967).
 
 
 8
 In order to make this determination, we look at whether there was a "reasonable possibility that the [error] complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963); see Fulminante, 111 S.Ct. at 1257 (State bears burden of demonstrating constitutional error did not contribute to conviction). "We must be convinced, from a review of the trial transcript, that the jury would not have found the state's case significantly less persuasive had the alleged uncounseled ... convictions not been brought to light." Twyman v. State, 560 F.2d 422, 423 (10th Cir.1977) (citing Bond v. State, 546 F.2d 1369, 1376 (10th Cir.1976)), cert. denied, 434 U.S. 1071 (1978).
 
 
 9
 In 1969, petitioner was charged with the rape of an eleven-year-old girl. The undisputed evidence showed that the victim and her younger brother lived with their grandmother and aunt. Their mother was serving a six-month sentence following a conviction for grand larceny at the time of the incident, but was released two days before the trial. On the evening in question, the two children were picked up by petitioner, a family friend of about three years. He took the children to a skating rink where he dropped the brother off. When petitioner returned the victim to the skating rink several hours later, she was hysterical and staggering. The security officer had her and her brother transported to the police station. She was later taken to a local hospital. When petitioner returned to the skating rink at eleven p.m. to pick the children up to take them home, he was told to go to the police station.
 
 
 10
 The prosecution urged the jury to accept the following version of the events that transpired before petitioner returned the victim to the skating rink:
 
 
 11
 Petitioner took the victim to his wife's apartment telling her he had some dresses for her to try on. The victim watched fifteen minutes of the "Get Smart" television program.[3] Petitioner gave the victim a total of four ten-milligram tablets of Valium while they were at the apartment. The victim testified that petitioner received a phone call during the evening. This fact was corroborated by the victim's aunt who stated she had made the call and the aunt's friend who had overheard the call. After administering the Valium and taking the phone call, petitioner instructed the victim to undress and assaulted her. When petitioner returned to the skating rink to pick the children up, he was told there was a problem with the victim, but he was not told there had been an assault or that he was a suspect. He was allowed to drive to the police station. When he saw the victim's brother there, he said: "[F]or all the stuff I've done for you and you've got to blame this on me." Tr. 519-20.
 
 
 12
 At trial, the examining physician testified that the victim had internal injuries consistent with trauma, although no sperm were noted. Her hymen was not completely intact. The physician also testified that the victim's hysteria was consistent with the amount of Valium ingestion alleged because children especially can have "adverse" reactions to Valium as a result of which the Valium acts as a stimulant.
 
 
 13
 The defense urged the jury to accept the following version:
 
 
 14
 Petitioner took the victim to Sears to buy her some dresses. He saw his name on a list at the cashiers, realized he could not charge anything, and took the victim, who was upset and crying because she couldn't get the dresses, back to the skating rink. She walked over to a car containing two boys and a girl. Petitioner left and went to a gas station. A witness friend of petitioner's who worked at the station corroborated the stop at the gas station, although he did not come forward until shortly before trial. When petitioner returned to the skating rink, he was arrested for sexual assault, prior to being allowed to drive to the police station. The defense theorized that the rape charges arose as a result of petitioner's interaction with the victim's aunt the previous evening when she had tried to get petitioner to give her money so she could get her husband out of jail. Petitioner refused, the aunt got mad, and decided to "get even" with him. At that time she took his money, checkbook, and some of his Valium.[4] Petitioner testified that he "emphatically and absolutely" did not "rape or have carnal knowledge" of the victim at any time.
 
 
 15
 The defense also presented testimony from a doctor who stated, without examining the victim, that her injuries were consistent with scratching herself and a resulting vaginitis. He testified that the victim's hysteria was not an expected reaction following the ingestion of forty milligrams of Valium.
 
 
 16
 The victim's mother testified for the defense that her daughter had lied to her "several different times," tr. at 926, usually when she did "not get her way," tr. at 927, and was lying about the rape. On cross examination, the prosecution brought out that after her return home from prison, the mother called petitioner's attorney and asked how much money he would give her for testifying for petitioner. She had previously written a letter in which she stated that since the damage had already been done to her daughter, if she could "get any money out of it," she would. Tr. at 1443-44. She also testified that the victim's aunt wanted petitioner in jail since he would not give her money.
 
 
 17
 At trial, petitioner admitted to the following prior convictions:
 
 
 18
 1. 1953: Armed robbery, Minnesota, seven-year sentence (invalid, uncounseled conviction);
 
 
 19
 2. 1953: Interstate transportation of a stolen vehicle, United States District Court for the Northern District of Oklahoma, three-year sentence, incarcerated nineteen months;
 
 
 20
 3. 1956: Escape from county jail as a parole violator, and interstate transportation of a stolen vehicle, Laredo, Texas, five-year sentence in federal prison;
 
 
 21
 4. 1960: "Pugilistic altercation" with brother-in-law, California, ten-day sentence;
 
 
 22
 5. 1960: Bogus check, California, eighteen months' imprisonment;
 
 
 23
 6. 1966: Contempt of court, Oklahoma;
 
 
 24
 7. 1969: Bogus check, Oklahoma, sixty days' imprisonment.
 
 
 25
 Only the admission of the 1953 conviction was error. Although it was one of petitioner's more serious convictions, it was only one of several felony convictions. Clearly it was cumulative. Moreover, the 1953 conviction was not a crime similar to that with which petitioner was then charged. See Zilka v. Estelle, 529 F.2d 388, 393 (5th Cir.) ("Similar crimes would, of course, have a much greater impact upon the jury"), cert. denied, 429 U.S. 981 (1976).
 
 
 26
 Our usual reluctance to find harmless error has been heightened because the jury deadlocked its first evening of deliberation. At that point, the jurors had deliberated less than five hours after a two-week trial. The court advised the jury to cease deliberations and because of the late hour to return the following morning.[5] The next morning the jury requested that five parts of the transcript be read to it:
 
 
 27
 1. Testimony of the service station attendant;
 
 
 28
 2. Petitioner's testimony regarding his stop at the station;
 
 
 29
 3. Testimony of Eunice Lee, petitioner's mother;
 
 
 30
 4. Testimony of the victim regarding the television program "Get Smart," which she stated she had watched; and
 
 
 31
 5. Testimony of the skating rink's security officer.
 
 
 32
 Following the readings, the jury returned its verdict of guilty in forty-eight minutes.
 
 
 33
 The jury was obviously concerned with its collective recollection of the evidence rather than deadlocked as to the jury members' conviction regarding petitioner's guilt or innocence. The fact that the jury returned with its verdict forty-eight minutes after the testimony was read suggests that the verdict was readily reached without a true deadlock-causing dispute after some confusion regarding the testimony was cleared up.
 
 
 34
 Finally, unlike in Loper, the credibility determination here was not balanced solely between testimony presented by petitioner and the victim. See Gibson v. United States, 575 F.2d 556, 560 (5th Cir.1978). Twenty-six witnesses were called. Although we cannot say the evidence was overwhelming, the victim's story was strongly supported by the testimony. Petitioner's story, on the other hand, was rather farfetched and the testimony of some of his witnesses was questionable.
 
 
 35
 Under all of these circumstances, we are persuaded that the error in admitting the 1953 conviction in petitioner's 1964 trial was harmless beyond a reasonable doubt. We are convinced the jury would not have found the state's case significantly less persuasive had the invalid 1953 conviction not been admitted. Consequently, the use of the 1964 conviction to enhance petitioner's sentence in 1984 was also without error.
 
 
 36
 The judgment of the United States District Court for the Northern District of Oklahoma is AFFIRMED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 In Oklahoma, enhancement may be predicated on only one prior conviction. See Carbray v. Champion, 905 F.2d 314, 316 (10th Cir.1990), cert. denied, 111 S.Ct. 796 (1991). The record shows that the state introduced only the 1969 conviction for enhancement purposes in 1984
 
 
 [2]
 We note that the error here "involved 'trial error'--error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Arizona v. Fulminante, 111 S.Ct. 1246, 1264 (1991)
 
 
 [3]
 The victim's version of the program did not correspond with the program actually aired, the script of which was admitted into evidence
 
 
 [4]
 The defense speculated that the victim took one of those Valium from her aunt
 
 
 [5]
 No Allen charge was given. See Allen v. United States, 164 U.S. 492 (1896)